# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 18, 2016 Session

## JOSEPH MARTIN COLLEY v. ALISHA DALE McBEE

**Appeal from the Circuit Court for Marion County**
**No. 15829     J. Curtis Smith, Judge**

_____

**No. M2014-02296-COA-R3-CV – Filed February 2, 2017**

_____


This case concerns modification of a parenting plan.  Following her divorce in Tennessee, Mother moved with her child to Maryland.  Father initially opposed the move, but an agreed order entered after the move adopted an amended permanent parenting plan, which named Mother the primary residential parent.  The amended permanent parenting plan granted Father parenting time over the summer, during certain holidays, and when either Father traveled to Maryland or Mother traveled to Tennessee.  After experiencing difficulties exercising parenting time and growing concern over Mother's care of the child, Father filed a petition requesting to be named primary residential parent.  The trial court denied the request.  Although it found a material change in circumstances based on the child's serious mental health issues, the court determined that it was in the best interest of the child to remain with Mother.  Father appeals arguing that the trial court erred in: (1) finding it was in the child's best interest for Mother to remain the primary residential parent; (2) not finding Mother in contempt; and (3) awarding attorney's fees to Mother.  We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Joseph Martin Colley, Whitwell, Tennessee, pro se appellant.

Trudy Bloodworth, Nashville, Tennessee, for the appellee, Alisha Dale McBee.

# OPINION

## I. FACTUAL HISTORY AND PROCEDURAL BACKGROUND

Alisha Dale McBee ("Mother") and Joseph M. Colley ("Father") are the parents of a child ("Child") born in 2003. They divorced on February 17, 2006, when Child was two. Mother was designated the primary residential parent.

In 2008, Mother moved with Child to Maryland. In response, Father filed a petition opposing parental relocation, to find Mother in contempt, and to modify custody in the Circuit Court for Marion County, Tennessee. The parties successfully mediated their dispute, and on April 17, 2008, the court entered an agreed order, which modified the previous permanent parenting plan.

Under the amended permanent parenting plan, Mother remained the primary residential parent. But the plan did not specify a number of days for Father to exercise his parenting time. The plan granted Father parenting time on every spring break and for thirty-five consecutive days in the summer. Otherwise, Father's parenting time was contingent on the parents' travel schedule.

The new plan allowed Father parenting time if he traveled to Maryland, and the plan also required Mother to notify Father if she traveled to Tennessee. If Mother came to Tennessee for Thanksgiving, Child went to Father on Thanksgiving Day at 2:00 p.m. If Mother did not come to Tennessee for Thanksgiving, the parties were to alternate the Thanksgiving holidays. For Christmas, if Mother came to Tennessee, Child went to Father from noon on Christmas day until the day before school or the date of Mother's departure. If Mother did not come to Tennessee, Child went to Father on December 23 until the day before school.

On April 16, 2012, Father filed a petition to modify the parenting plan. Father alleged a material change in circumstances because of Mother's failure to notify Father of Child's multiple hospitalizations due to mental health issues and withholding of medical information regarding Child. Father also alleged that Mother stated she was "unable to 'handle' the child." According to Father, Mother's lifestyle was unstable and negatively affected Child's mental and physical health. Father attached a proposed parenting schedule to his petition, which essentially swapped the provisions from the amended permanent parenting plan in terms of primary residential parent and parenting time.

### A. PROOF AT HEARING

On April 11 and 29, 2014, the trial court held a hearing on Father's petition. Both parents testified, offering contradictory views of Child's mental health. According to

Mother, Child started counseling and therapy in 2007 at the age of four. That year, Child ate the pet fish; was harming himself; had problems with other children at preschool; and was lashing out, hitting, spitting, and biting. Specifically at home, Child's behavior included banging his head against the wall; spinning; holding his half-sister down and pulling her hair; running into walls trying to harm himself; trying to harm the family dog; and pulling the tails off of two gerbils.

Child started in a "regular" school and continued therapy, but an incident late in 2010 changed that. According to Mother, during bath time, Child ripped a towel bar off of the bathroom wall and attempted to hit Mother on the head. Child's half-sister and Mother locked Child in the bathroom, but Child continued to beat on the door and broke all of the glass in the bathroom. Mother called the police, and they transported him to the Rockford Center, a mental health facility. This episode led to a series of hospitalizations for Child in 2010[1] and 2011.

During this time period, Child also began taking medications for his behavior. According to Mother, Child took medications for attention-deficit/hyperactivity disorder ("ADHD") and mood and anxiety disorders.

In July of 2012, following a visit with Father, Mother took Child to the doctor because, upon his return, he was very agitated, fidgety, and vomiting. The doctor's visit led to Child's admission at Sheppard Pratt, another mental health facility. July 1, 2012, would be the last time Father saw Child.

Child returned to Sheppard Pratt in December of 2012. Thereafter, Child had multiple admissions, primarily at Sheppard Pratt, through August of 2013. The admissions generally lasted weeks.

In August 2013, Child went from Sheppard Pratt to St. Vincent's Villa, a residential treatment facility for children with behavioral and emotional challenges. At the time of the hearing on Father's petition, Child had been at St. Vincent's Villa continuously except for the weekly twenty-four hour periods that Mother was allowed to bring Child home for visits.

Father's assessment of Child's mental health and behavior was markedly different than Mother's. In most respects, Father believed Child to be like any other child. At one point, Father compared child to his step-son:

> He – [Step-son], he – they have the same traits when it comes to, you know, they – [Child], he gets up in the morning. He is a good kid. He's got a smile on his face first thing in the morning. He goes to bed at night. You

---

[1] There was conflicting testimony on when the hospitalizations began.

3

don't have to chase him off to bed. He is good about that. Overall, he is – he is a good kid. He just – he is always – he is full of energy. He – he loves his LEGOs and all that stuff like that, you know. He's got his shows that he likes and stuff like that, but he is no different than [Step-son] is when it comes to – I mean, they are both, you know, good kids. In my opinion, they are – they act like any other kid.

Father did not dispute the diagnoses for Child, but he did question Child's treatment. Father described an incident in 2009 after giving Child the medication Mother had provided:

I'd bought [Child] a bunch of these Star Wars action figures and he was in there playing and he got quiet and the next thing I know, he is walking around the house and he is mumbling. And I said, "what are you saying, buddy?" And he finally got close enough I could hear what he was saying and he was looking for his action figures. Well, the whole time he had every one of his action figures in his hand, but it's just like he went from being normal to like a zombie just wandering the house and it just scared me to death, you know.

Father felt that Child could be treated on an outpatient basis and needed to be home. He also felt that the repeated hospitalizations were harmful. Father testified that he had researched and lined up psychiatric care and special education services for Child should he become the primary residential parent.

Father also testified regarding problems he experienced with Mother. When Child did visit, Father claimed that Mother would only send enough medication for the duration of the visit, providing no extra for unforeseen circumstances. Father stated, and Mother acknowledged, in one instance she did not send enough medication for Child's visit with Father and, in another instance, provided medication in bottles with hand-written labels.

Father complained about Mother's failure to inform him of Child's hospitalizations. Once, Father only discovered Child had been hospitalized through family members who presumably heard from Mother's family living in Marion County. In her testimony, Mother seemed to blame the failure to communicate on hospital rules that prevented her from using her mobile phone, but she denied intentionally keeping information from Father. However, she admitted on cross-examination that she had not kept Father informed of changes in school, which was a requirement of the amended permanent parenting plan.

Since July 1, 2012, Father has had limited contact with Child. He telephoned Child at St. Vincent's, but he was not always allowed to speak with him. When he

attempted to arrange a visit, St. Vincent informed Father that the visit would have to be approved by Mother and arranged through her.

In addition to testimony at the hearing, the trial court admitted the depositions of individuals involved in Child's treatment at St. Vincent's Villa: Paula Sherman, Dr. Mohammad Miasami, and Mindy Leifer. Ms. Sherman worked as an intern at St. Vincent's Villa; at the time, she was studying for her Masters Degree in Social Work. Her testimony related to Child's individual therapy, family therapy, and group therapy.

Ms. Sherman testified that Child was not very interested in therapy initially. She stated that his behavior was "unsafe." She explained that the facility had to make sure that someone was always there in case the therapists needed assistance. Child would "bolt," as in he would suddenly run out of the unit. They knew that he had a history of violence with other people based upon the unit he had been in previously. She described him as being agitated on some days and happy on others. According to her, many factors affected his state of mind.

Despite this, Ms. Sherman testified that Child was making progress towards the goal of going home. She stated Child had been less violent overall and had made better peer relationships and staff relationships. She described Child as working on improving his behaviors and coping skills and stated that he "really wants to do well" at St. Vincent's. Ms. Sherman also stated that Child's relationship with Mother was very good and that they worked well as a team.

Yet, Ms. Sherman also stated that Child had a lot left to do. She testified that his behavior was very unpredictable and he had trouble controlling his behavior. She opined that more time in a residential center would be helpful to him.

Dr. Mohammad Miasami, a professor of psychiatry and pediatrics at Johns Hopkins University, conducted Child's initial psychiatric evaluation upon his admission to St. Vincent's. He diagnosed Child with mood disorder (not otherwise specified); oppositional defiant disorder; ADHD; autism spectrum disorder; and a parent-child relational problem. He also testified about residential care and why it was beneficial to Child. He stated that ninety percent of the time, residential care, such as that offered at St. Vincent's, was preceded by hospitalization and acute care. Residential care provided intensive integrated multi-model therapies, including "individual therapy, . . . group therapy, . . . recreational therapy, . . . [and] residential counselors, [to] monitor and sector and supervise him 24/7." St. Vincent's also provided "a special educational program, instructional assistance, crisis management and supervision."

Dr. Miasami also testified about Child's medications. Dr. Miasami had prescribed several medications. Child's medications included Depakote, a mood stabilizer; Trazodone, a mild antidepressant used for sleep; Clonidine, to control ADD

hyperactivity/ADHD and to help Child calm down; Vyvanse, for ADHD; Abilify, used for controlling assault disorder and aggression as well as augmenting the mood stabilizer; and DDAVP, used for bedwetting.

Dr. Miasami opined that Child had made relative improvement, but not to the extent that he could leave residential treatment. Dr. Miasami explained:

> [Child] has [sic] extreme irritable [sic], all the things that you said, that I identified as major or chief complaints. All those problems interferes [sic] with his individual relationships, with peer relationships, compliance with the routine, and at times he becomes self-injurious and aggressive. I have to say all those exist, but the severity is reduced and frequency is reduced, but he still has problems. When he still needs one-to-one [therapy] in school and one-to-one [therapy] in residence, that means he still needs intensive therapy, our residential treatment therapy. And the good advantage we have is his school is walking distance within five minutes from the residence and the team could collaborate with each other, enhance his improvement and provide consistency, consistency to change behavior. Changing the old behavior and teaching him new behavior takes a lot of effort, consistency and consistency.
>
> . . . .
>
> At this stage, I could testify to the fact that he still requires the treatment provided. I do know that he has had some momentum and some improvement, and I do think if we make any changes, because particularly he has autism and transitions are very difficult for him, he would lose the gain he's had here so far. It doesn't mean in future [sic] if he made enough of improvement and there's another identical program like ours found in any geographic place, we may not be able to help the transition, but at the present time, he cannot move to less [sic] restrictive environment and he's not finished with his treatment here.

Dr. Miasami stated that the eventual goal of any treatment was to discharge the patient. But, in Child's case, his treatment team believed he still required treatment at St. Vincent's.

Mindy Leifer was a social worker at St. Vincent's. She worked as an individual, group, and family therapist for a unit of ten boys, which included Child. When Child first came to St. Vincent's, he "presented with anxiety, conduct issues, school problems, social and problems with peers and problems with self-care and some sleep problems." She explained that Child's parent-child relational diagnosis related to his difficulty in accepting directives, being aggressive, and being oppositional at home.

6

Ms. Leifer described Child's treatment plan and care.

> [I]ndividual therapy to assist him in dealing with past traumas, identifying feelings, working on social skills, peer relationships, getting along at home, dealing with mood lability. We have psycho pharmacotherapy, which is basically use of psychotropic drugs. He's on medication to deal with mood, deal with hyperactivity and impulsivity, to deal with attention deficit and to deal with sleep difficulties. He has family therapy to help others learn about his illness, help them work with issues at home, group therapy to deal with social and peer relationships. There are therapeutic milieu, which is day-to-day living. He attends a private separate day school which provides a small classroom, crisis intervention, one-to-one assistance.

Ms. Leifer also described Child's progress. According to her, Child was responding well to his therapy at St. Vincent's and was improving. However, she opined that it would not be in Child's best interest to be discharged because, while he had improved, he would not be successful without the structure provided by St. Vincent's. Ms. Leifer stated that, when Child was first brought to St. Vincent's, he heard voices and that had subsided. But she warned that the voices might return if he was discharged too early. In addition, according to Ms. Leifer, leaving at this point in his therapy would be stressful, and he was at risk of causing harm to himself due to his impulsivity.

Ms. Leifer testified that, although the ultimate goal was for Child to be released, he would be unable to attend a regular public school. She did not believe he could manage a public school. She thought he would most likely have to attend a school run by St. Vincent's and be evaluated yearly.

## B. TRIAL COURT'S RULINGS

On October 10, 2014, the trial court entered its Memorandum Opinion and Order denying Father's request for a change of primary residential parent. Although finding Mother not to be credible, the court explained that "her testimony about [Child's] mental health problems [wa]s corroborated by medical proof." The court found that Child had a "significant psychological illness" and noted that he had been diagnosed with disruptive mood dysregulation disorder, ADHD, and autism spectrum disorder.

Based on Child's mental condition, the court concluded that there had been a material change of circumstance since approval of the amended permanent parenting plan. *See* Tenn. Code Ann. § 36-6-106(a)(2)(B) (2014). However, after considering the best interest factors, *see* Tennessee Code Annotated § 36-6-106(a) (2014),[2] the court

---

[2] The hearing in this case took place before the effective date of the 2014 revisions to Tennessee

7

determined that it was in Child's best interest to remain with Mother and to continue with his current mental health providers in Maryland.

In the Memorandum Opinion and Order, the trial court also denied Father's request to hold Mother in contempt for violation of the amended permanent parenting plan. The court determined that Mother's decision to prevent Father from exercising his parenting time in Tennessee was due to medical necessity and not a willful violation of the plan.

On May 5, 2015, the trial court entered a separate order approving a parenting plan. The order provided the amended permanent parenting plan would remain in place, but the court adopted an alternative parenting plan to be effective when Child was "in residential and/or in-patient treatment." Under the order, Mother was required to notify the circuit court clerk in writing within five days of Child's admission or discharge from a residential or in-patient treatment program.

On May 26, 2015, the trial court entered an order on Mother's request for award of her attorney's fees and costs. The court awarded Mother $7,000 in attorney's fees to be paid at the rate of $500 per month.

## II. ANALYSIS

On appeal, Father argues the trial court erred in: (1) finding a material change but still determining it to be in the best interest of the child to remain with Mother; (2) failing to find Mother in contempt; and (3) awarding Mother $7,000 in attorney's fees.

### A. STANDARD OF REVIEW

We review the trial court's findings of fact de novo on the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). In weighing the preponderance of the evidence, determinations of witness credibility are given great weight, and they will not be overturned without clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). "Because '[c]ustody . . . determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings themselves, appellate courts 'are reluctant to second-guess a trial court's decisions.'" *In re Alexandra J.D.*, No. E2009-00459-COA-R3-JV, 2010 WL 5093862, at *3 (Tenn. Ct. App. Dec. 10, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). We review the trial court's conclusions of law de novo with no presumption of correctness. Tenn. R. App. P. 13(d); *Armbrister*, 414 S.W.3d at 692.

---

Code Annotated § 36-6-106(a). The citations in this opinion are to the pre-2014 version of the statute.

## B. PRIMARY RESIDENTIAL PARENT

Adjudicating disputes over who should be designated the primary residential parent is one of a court's greatest responsibilities. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). A court's designation of the primary residential parent as part of a final decree of divorce is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, because circumstances change in unanticipated ways, courts are statutorily empowered to modify a primary residential parent designation. *See* Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2016) (indicating a decree awarding custody of a minor child "shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require").

Courts apply a two-step analysis to primary residential parent designation decisions. *Keisling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). The threshold issue is whether a material change in circumstance has occurred since the court's prior custody order. *Armbrister*, 414 S.W.3d at 697-98; Tenn. Code Ann. § 36-6-101(a)(2)(B). Only if a material change in circumstance has occurred do we consider whether a modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705. The "determinations of whether a material change of circumstances has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Decisions on questions related to custody and visitation should be directed towards promoting the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996).

The parent requesting a change in the primary residential parent has the burden of proving the threshold issue of a material change in circumstance by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(B). In this case, Father does not contest the trial court's finding a material change. Rather, Father argues that the trial court erred in determining the child's best interest.

In determining a child's best interest, courts must consider a non-exclusive list of factors found at Tennessee Code Annotated § 36-6-106(a). The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Under the analysis, the trial court must determine which parent is "comparatively more fit than the other to be the custodial parent." *Id.*

9

As stated above, the determination of where the best interests of the child lie is a factual question. *In re T.C.D.*, 261 S.W.3d at 742. On appeal, we presume that the trial court's findings are correct unless the evidence preponderates against them. *Armbrister*, 414 S.W.3d at 693; *see* Tenn. R. App. P. 13(d). In order for evidence to preponderate against a finding of the trial court, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000)).

The trial court made factual findings relative to several of the best interest factors. In doing so, the court determined the following factors favored Mother over Father:

> **(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child; and**
>
> **(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities.** Because of [Child's] lengthy and on-going mental condition Mother has overseen his treatment and is more attuned to his condition and needs. She has performed the majority of daily parenting responsibilities. As a result she has a much stronger and more stable relationship with [Child]. The Court places heavy weight on these factors in Mother's favor in the best interest analysis.
>
>     . . . .
>
> **(6) The love, affection, and emotional ties existing between each parent and the child.** Father has had little recent opportunity to develop ties with his son because of [Child's] unfortunate mental condition. However this Court must evaluate this factor based on present circumstances and places moderate weight in the best interest analysis in favor of Mother.
>
> **(7) The emotional needs and developmental level of the child.** [Child] has substantial emotional needs and his developmental level presently is extremely limited. Since Mother is more intimately acquainted with his emotional needs and level of development the Court places heavy weight in her favor in the best interest analysis.
>
> **(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment.** Continuity is of utmost importance in [Child's] life if he is to achieve some semblance of a normal life. He will likely remain in counseling and must

10

remain in an extremely structured environment at least until he is 18 years old. Since Mother is more attuned and acquainted with his needs the Court places heavy weight on this factor in her favor in the best interest analysis.

The court did not find that any of the best interest factors weighed in favor of Father. The court then concluded that Child's best interest was not to change the primary residential parent:

> The medical proof substantiates Mother's testimony that [Child] is presently unable to function in a normal fashion. All his care has been provided in the geographic area where Mother resides and it is not in [Child's] best interest that he be placed under the care of different doctors and other personnel as such would be detrimental to his well-being. The Court has concerns for the well-being of [Child's half- and step-siblings] if [Child] lived in Father's home. The Court concludes that it is in [Child's] best interest that Mother remain his primary parent.

Father takes issue with the court's best interest analysis. He argues that best interest factors 1 and 5 actually weigh in his favor. Factor 1 concerns the strength, nature, and stability of each parent's relationship with the child, including whether one parent has performed the majority of parenting responsibilities. Tenn. Code Ann. § 36-6-106(a)(1). Factor 5 considers the degree to which one parent has been the primary caregiver. *Id.* § 36-6-106(a)(5).

From our review of the record, the evidence does not preponderate against the trial court's factual finding, and we discern no error in the weighing of factors 1 and 5. The trial court found these factors weighed in favor of Mother because Mother had been the primary caregiver since the divorce. She had overseen Child's treatment for his mental illnesses and was therefore attuned to Child's condition and needs. The trial court also found that Mother had a stronger and more stable relationship with Child than Father, which would be a natural consequence of spending considerably more time with Child.

In addition to misapplication of factors 1 and 5, Father argues that the trial court failed to consider factors 8, 9, and 11; factors he submits weigh in his favor. Factor 8 concerns the moral, physical, mental, and emotional fitness of each parent as it relates to their ability to parent the child. *Id.* § 36-6-106(a)(8). Father claims there was domestic violence involved in Mother's most recent marriage. He argues she had moved residences four times and placed Child in six different schools since she moved to Maryland. He also argues Mother's health, including migraines and breast cancer, posed obstacles to her ability to parent. He, on the other hand, had a stable home and no health issues.

11

We respectfully disagree with Father's assessment of factor 8. Mother testified that she moved to Maryland because of her previous husband's job. Mother and her former husband separated in 2010 and divorced in 2013. Mother was with her former husband only a short period of time, and there was no evidence that Mother's former husband was involved in her life since the divorce.

Mother admitted that she had moved multiple times since moving to Maryland, but she provided adequate explanations for the moves. She was attempting to find the best situation for Child and his half-sister. We have recognized that school changes may be detrimental to a child. *See S.A.M.D. v. J.P.D.*, W2011-01256-COA-R3-CV, 2012 WL 5266194, at *17 (Tenn. Ct. App. Oct. 25, 2012). But in this situation Child's mental health required specialized treatment, and it is understandable that the treatment might necessitate moves and changes of schools.

Factor 9 focuses on the child's interaction and relationships with siblings and relatives and involvement with physical surroundings, school, and other significant activities. Tenn. Code Ann. § 36-6-106(a)(9). For his argument that factor 9 weighs in his favor, Father submits that Child never displayed aggressive behavior in front of him and that he was not concerned that Child might harm others in his household. However, even if we discount Mother's testimony, Ms. Sherman testified that Child's previous unit was known for having violent patients and that his behavior upon admission at St. Vincent's was "unsafe." Dr. Miasami also testified that he had prescribed medication to treat Child's "assault disorder" and aggression. Although the proof showed that Child was making progress in dealing with his aggressive behavior, factor 9 does not favor Father.

Finally, factor 11 requires the court to consider whether there is any evidence of physical or emotional abuse of the child. *Id.* § 36-6-106(a)(11). Father cites to one instance in which Mother informed Father of a cut on Child's head that, after a medical visit, did not require stitches. Father also claims that Child's admission to mental health facilities on multiple occasions constitutes abuse. In light of the medical proof, we disagree. This record does not support a finding of either physical or emotional abuse.

We conclude that the trial court appropriately weighed the best interest factors and found that it was in the child's best interest for Mother to remain the primary residential parent. The court found that Child had serious mental health issues and that premature removal from treatment could cause harm. Furthermore, the court stated that it appeared that Father was not thoroughly convinced of the severity of Child's mental health issues. The evidence does not preponderate against any of these findings.

## C. CONTEMPT

Father argues that the trial court erred in not holding Mother in contempt. In denying Father's request, the court made the following findings:

> This Court has the power to inflict punishment for contempt for the willful disobedience of any order of the court pursuant to T.C.A. § 29-9-102. Father argues Mother willfully failed to comply with the current Parenting Plan. The proof has established [Child's] long-standing psychological problems and the extensive care that he has received. Mother has failed to effectively inform Father of [Child's] treatment. Even if she had done better at communicating the details of [Child's] treatment to Father the Court doubts Father would have accepted the information as true or necessary. The Court concludes Mother's actions in not allowing Father to exercise parenting time in Tennessee was based on medical necessity and not a willful violation of Court order.

Tennessee Code Annotated § 29-9-102 grants courts the power to "issue attachments, and inflict punishments for contempts of court" for "[t]he willful disobedience or resistance of any officer of such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts." *Id.* § 29-9-102(3) (2010). Civil or criminal contempt requires four elements: (1) the order allegedly violated must be lawful; (2) the order must be clear and unambiguous; (3) the individual charged must have violated the order; and (4) the individual must have acted willfully in violating the order. *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008); *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011) (stating that the four-element analysis outlined in *Konvalinka* applies to criminal and civil contempt actions). The only element at issue here is whether Mother acted willfully in violating the amended permanent parenting plan by not permitting Father to exercise his visitation.

In the context of civil contempt, "a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *State ex rel. Flowers v. Tenn. Trucking Ass'n Self. Ins. Grp. Trust*, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006)). Our Supreme Court has addressed the standard of review for a trial court's willfulness determination:

> Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding "willfulness" should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

*Id.* at 357. In other words, we will review the trial court's finding on willfulness "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d).

The evidence does not preponderate against the trial court's factual findings that Mother's actions were based on medical necessity. The proof showed that Mother was allowed only once weekly visits of twenty-four hours at a time. As such, the court did not err in denying Father's request.

## D. ATTORNEY'S FEES

Mother sought attorney's fees at the conclusion of the hearing. Father argues that the trial court erred in awarding attorney's fees to Mother. The trial court entered the following order:

> Before the Court is an application asking Joseph Martin Colley, Petitioner ("Mr. Colley"), to pay attorney's fees and costs in the amount of $13,162.25 filed by Catherine White ("Ms.White"), former counsel for Alisha Dale McBee, Defendant and Respondent ("Ms. McBee"). . . .

> The Court finds that Ms. White was reasonably successful in this litigation on behalf of her client but that the litigation was unduly prolonged by tactics employed by Ms. McBee. The Court finds the amount of attorney's fees and costs submitted by Ms. White is reasonable based on applicable legal standards but because Ms. McBee prolonged this litigation, the full amount of fees and costs requested should not be awarded. The Court concludes that Ms. McBee has the financial need and Mr. Colley has the financial ability to pay the sum of $7,000

Tennessee courts follow the American Rule, which provides that litigants are responsible for paying their own attorney's fees unless there is a statutory or contractual provision stating otherwise. *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Tennessee Code Annotated § 36-5-103(c) does permit an award of attorney's fees when one parent successfully defends a prior primary residential parent designation. *See Shofner v. Shofner*, 232 S.W.3d 36, 40 (Tenn. Ct. App. 2007); *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *7 (Tenn. Ct. App. Feb. 28, 2007). The statute provides as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in

14

enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c) (2014). We have observed that "requiring parents who precipitate custody or support proceedings to underwrite the costs if their claims are ultimately found to be unwarranted is appropriate as a matter of policy." *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992). The award of attorney's fees is within the trial court's sole discretion, and we will not interfere with the trial court's decision absent a clear showing of an abuse of that discretion. *See, e.g.*, *Taylor*, 158 S.W.3d at 359.

We affirm the award of attorney's fees. Father has not shown a clear abuse of discretion on the part of the trial court.

### III. CONCLUSION

We affirm the denial of Father's request to change the primary residential parent. The trial court appropriately considered the best interest factors and the evidence does not weigh against its factual finding. We also affirm the denial of the request to hold Mother in contempt and the award of attorney's fees to Mother. This case is remanded to the trial court for such further proceedings as may be necessary and consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE

15